UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------X
DAVID RICKETTS,

                Plaintiff,

        -against-

MOFFATT & NICHOL, INC.,

                Defendant.
------------------------------------------------------------X

**MEMORANDUM
AND ORDER**
23-CV-5011 (TAM)

**TARYN A. MERKL**, United States Magistrate Judge:

On July 3, 2023, David Ricketts ("Plaintiff" or "Ricketts") filed this action against

Moffatt & Nichol, Inc. ("Defendant," "Moffatt & Nichol," or "M&N"), for allegations

stemming from an incident where Plaintiff fell off a truck's lift gate while unloading

dive equipment and suffered injuries to his lower body, claiming negligence and future

maintenance under the Jones Act, 46 U.S.C. § 30104 *et seq*. *See generally* Compl., ECF 1.

Defendant and Plaintiff have each moved for partial summary judgment on a singular

issue: whether Plaintiff is a seaman under the Jones Act and attendant caselaw. Def.

Mot. for Partial Summ. J. ("Def. Mot."), ECF 37; Pl. Cross-Mot. for Partial Summ. J. ("Pl.

Cross-Mot."), ECF 33. For the reasons discussed below, the Court finds that there are

genuine disputes of material fact that foreclose the parties' motions for partial summary

judgment.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I. Factual Background

Defendant Moffatt & Nichol is a "global infrastructure advisory firm" that

"provides engineering and consulting services" to marine terminal and transportation

clients. Pl. Rule 56.1 Statement ("Pl. 56.1"), ECF 33-1, ¶ 1 (quotation marks omitted); *see*

Def. Counter Rule 56.1 Statement ("Def. Counter-56.1"), ECF 38-1, ¶ 1. On December 15, 2017, Defendant offered Plaintiff a position as a Dive Technician in its Norfolk, Virginia office. Def. Rule 56.1 Statement ("Def. 56.1"), ECF 37-10, ¶ 2; *see also* Employment Offer, ECF 37-4. In this position, Plaintiff assisted with "underwater inspections, topside inspections, and from the water up inspections of bridges," bulkheads, and other structures, as well as equipment maintenance. Def. 56.1, ECF 37-10, ¶ 4; *see* Pl. 56.1, ECF 33-1, ¶ 3; Pl. Dep., ECF 33-9, at 65:17–25, 67:8–10; *see also* Melnyczuk Dep., ECF 33-10, at 22:2–5.[1]

Not all inspections required the use of a vessel. Plaintiff could dive from a boat, from shore, or from the back of a truck to conduct inspections, depending on how the structure being inspected was best accessed. Def. 56.1, ECF 37-10, ¶¶ 6–12; Pl. Dep., ECF 33-9, at 39:8–41:4, 67:11–13. When a vessel was required, it would be launched from a boat launch, then navigated to the inspection site; it could either be tied up with the engines turned off, or maneuvering or idling during the inspection. Def. 56.1, ECF 37-10, ¶¶ 8–9; Pl. Dep., ECF 33-9, at 68:23–69:8. The vessel would be turned off while divers were in the water. Def. 56.1, ECF 37-10, ¶ 8; Pl. Dep., ECF 33-9, at 68:21–22. If Plaintiff was not himself conducting the inspection, he might navigate the boat, or one of the other two divers he worked with in Norfolk would do so. Pl. Dep., ECF 33-9, at 67:20–68:5. In Norfolk, Plaintiff's crew utilized four kinds of boats: a 32-foot dive boat, a 24-

---

[1] Both Plaintiff and Defendant filed copies of Plaintiff's deposition, taken July 31, 2024. *See* Pl. Dep., ECF 33-9 (filed in full by Plaintiff); Pl. Dep., ECF 37-3 (filed excerpted by Defendant). Unless otherwise specified, this Memorandum and Order refers to the full, unexcerpted copy of Plaintiff's deposition filed by Plaintiff at ECF 33-9.

foot pontoon boat, a 16-foot skiff, and a 14-foot jon boat.[2] Pl. Dep., ECF 33-9, at 49:22–50:22.

Plaintiff's responsibilities also included administrative and maintenance work. Following an inspection, Plaintiff would generate a report that documented the equipment used for the inspection and how the site was accessed. Def. 56.1, ECF 37-10, ¶ 14; Pl. Dep., ECF 33-9, at 74:16–75:2. These reports would also include information about whether a vessel was used on a given project. Pl. Dep., ECF 33-9, at 74:5–76:10, 78:3–13. At other times, he would draft reports, dive supervisor notebooks, or safety plans for upcoming jobs, which he could do from the field or on site. *See id.* at 124:11–125:9, 133:2–4. While stationed in Norfolk, Plaintiff spent approximately one week in the field, then one week in the office generating reports and planning future inspections. Def. 56.1, ECF 37-10, ¶¶ 15–16; Pl. Dep., ECF 33-9, at 76:24–77:8. If Plaintiff was not in the field, he could work from home or his office in Norfolk. Pl. Dep., ECF 33-9, at 134:22–135:3. Certain days were set aside for boat and gear maintenance, which would be done at various onshore sites. *See id.* at 133:19–134:17.

While Plaintiff was based in Norfolk, he occasionally traveled to New York to assist with inspection projects there. Def. 56.1, ECF 37-10, ¶ 17; Pl. Dep., ECF 33-9, at 24:20–25, 46:16–47:10. On February 19, 2021, M&N transferred Ricketts from Norfolk to New York, effective March 28, 2021. Def. 56.1, ECF 37-10, ¶ 18; *see* Transfer Mem., ECF 33-8. His title remained the same. *See* Transfer Mem., ECF 33-8. Although the work in New York was largely the same as in Norfolk, the record on summary judgment suggests that Plaintiff's position in New York involved more time on a boat and less in

---

[2] A jon boat is a flat-bottomed boat. *See* Pl. Dep., ECF 33-9, at 89:23–24.

an office. *See* Def. 56.1, ECF 37-10, ¶ 19; Pl. Dep., ECF 33-9, at 65:17–66:15, 90:16–91:16. For example, Plaintiff testified at his deposition that he had "never been to an office in New York City at Moffatt & Nichol ever." Pl. Dep., ECF 33-9, at 109:9–10.

Like in Norfolk, the New York inspection projects sometimes used a vessel, and other times did not. Def. 56.1, ECF 37-10, ¶ 27; Pl. Dep., ECF 33-9, at 110:15–17. When a vessel was required for an inspection, Plaintiff would operate the vessel, "often navigating through strong currents and into restricted areas," and then perform "underwater inspections using dive helmets with surface-supplied air." Pl. 56.1, ECF 33-1, ¶¶ 15–16; *see id.* ¶¶ 21–23; Def. Counter-56.1, ECF 38-1, ¶¶ 15–16, 21–23; *see also* Melnyczuk Dep., ECF 33-10, at 28:4–24, 30:17–31:10, 31:11–32:6 (describing the mechanics of conducting topside, above the water, and underwater inspections). Plaintiff was also "responsible for maintaining dive gear and conducting vessel maintenance." Def. 56.1, ECF 37-10, ¶ 28; *see* Pl. Dep., ECF 33-9, at 133:19–23; Pl. 56.1, ECF 33-1, ¶ 13. The dive gear for which Plaintiff was responsible for maintenance included umbilical hoses, which "supply air to the divers' helmets" and "allow[] [two]-way conversations between boat and diver" while underwater. Pl. 56.1, ECF 33-1, ¶¶ 8, 13; *see* Def. Counter-56.1, ECF 38-1, ¶¶ 8, 13. Plaintiff represented in an affirmation that, "[m]ost often [he] was the supervising technician overseeing dive operations, and . . . responsible for navigation and dive safety." Ricketts Affirmation, ECF 33-6, ¶ 12.

In New York, Plaintiff's crew used at least two boats: the Pile Diver, "a 28[-foot] aluminum inboard engine powered vessel," and a 16-foot jon boat. Pl. 56.1, ECF 33-1, ¶¶ 7–8; Def. 56.1, ECF 37-10, ¶ 20; Pl. Dep., ECF 33-9, at 51:2–5, 88:24–89:22; *see* Def. Counter-56.1, ECF 38-1, ¶¶ 7–8; *see also* Melnyczuk Dep., ECF 33-10, at 59:15–60:21 (discussing a 26-foot skiff named the Pier Review II). In New York, unlike in Norfolk, M&N used a dedicated slip at Liberty Landing Marina in Jersey City, New Jersey, from

4

which location the Pile Diver would navigate to the project sites where inspection work was scheduled to take place. Pl. 56.1, ECF 33-1, ¶¶ 9–11; Def. 56.1, ECF 37-10, ¶¶ 21–25; Pl. Dep., ECF 33-9, at 55:23–56:8; *see* Def. Counter-56.1, ECF 38-1, ¶¶ 9–11. This included travel on the Hudson River and through the New York Harbor, "annually one of the busiest in the world." Pl. 56.1, ECF 33-1, ¶¶ 10, 18; *see* Def. Counter-56.1, ECF 38-1, ¶¶ 10, 18. When Plaintiff was not using a vessel, he would use a "Big Box Truck" as a diving platform.[3] Def. 56.1, ECF 37-10, ¶ 27; Pl. Dep., ECF 33-9, at 146:13–16, 248:15–19; *see* Pl. 56.1, ECF 33-1, ¶¶ 43, 92.

At his deposition, Plaintiff testified as to a typical eight-hour workday while stationed in New York. *See* Pl. Dep., ECF 33-9, at 102:24–105:20. After arriving at Liberty Landing, he would fuel the boat and "get [it] seaworthy" — ensure the bilge pumps were operational, navigation lights were powered, warm up the engines, etc. *Id.* at 103:16–18, 105:24–106:9. Once the crew was ready to depart, Plaintiff or one of his crew members would navigate to the inspection site and ask the on-site contractors "what work they had ready for us." *Id.* at 103:18–22. If the contractors had work ready for underwater inspections, the crew "would set up dive operations," a process that could take "an hour and a half." *Id.* at 103:23–104:24. A dive would last two to three hours. *Id.* at 104:6–9. If there was no underwater work, the crew would break down the dive gear and prepare to return to Liberty Landing, and "if there was anything [they] could look at from floating, [they] would look at it from floating." *Id.* at 104:10–17. After returning

---

[3] Plaintiff alleges that he was injured while performing maintenance on one of the Pile Diver's umbilical systems while standing on the lift gate of this truck. *See* Compl., ECF 1, ¶¶ 13, 17, 19; Ricketts Affirmation, ECF 33-6, ¶ 17. *But see* Def. Mem., ECF 37-9, at 12 n.5 (noting that "[t]he nature, circumstances, and cause of [Plaintiff's] injury are disputed and are not the subject of this motion").

to Liberty Landing, the crew would clean their wetsuits and dive gear, remove dive helmets from the boat and clean them, and prepare the air compressors for the following day, a process that could take another hour. *Id.* at 104:17–22, 105:17–20; *see id.* at 253:20–23 (defining the colloquial term "dive hat" as "the apparatus, the helmet, we use to dive").

In New York as in Norfolk, Plaintiff generated contemporaneous reports that indicated whether a given project used a vessel or not, what tasks were completed during each project, and how many hours Plaintiff spent working (on or off vessel). Pl. 56.1, ECF 33-1, ¶ 14; Def. Counter-56.1, ECF 38-1, ¶ 14; Pl. Dep., ECF 33-9, at 79:4–10, 81:20–88:13; *see* Melnyczuk Decl., ECF 37-7, ¶¶ 13–14. Plaintiff testified that it would be possible to glean which projects and tasks required the use of a boat by comparing Plaintiff's time sheets, inspection reports, vessel logs, and dive logs. Pl. Dep., ECF 33-9, at 87:6–88:13.

Defendant reviewed these reports to identify the working hours Plaintiff spent on a vessel and which working hours he did not, beginning on January 8, 2018 (the date Ricketts began working at M&N), through January 14, 2022 (the date of Ricketts' injury), to prepare a Vessel Time Analysis. *See generally* Joint Ex. 1 ("Vessel Time Analysis"), ECF 37-13; *see* Def. 56.1, ECF 37-10, ¶¶ 33–59 (describing the process of creating the Vessel Time Analysis). Defendant exported the contemporaneous reports from its timekeeping software, which included a field for a project description, then identified whether Plaintiff had been working on a vessel during the associated entry based on a manual review of the project description. Def. 56.1, ECF 37-10, ¶¶ 42–54. If Plaintiff worked on multiple projects in one day, the Vessel Time Analysis indicates multiple entries. *See generally* Vessel Time Analysis, ECF 37-13. For the period of time that Plaintiff was based in New York, this manual review was completed by David

6

Melnyczuk, Plaintiff's supervisor in New York; for the period that Plaintiff was based in Norfolk, the review was completed by Samantha McElroy, a senior project administrator at M&N, in consultation with Melnyczuk and Joshua Hill, another of Plaintiff's supervisors. Def. 56.1, ECF 37-10, ¶¶ 49, 55–56; *see* McElroy Decl., ECF 37-8, ¶¶ 1–2, 6; Melnyczuk Decl., ECF 37-7, ¶¶ 6–7, 23. Any doubt or ambiguity about whether Plaintiff used a boat during a particular project was resolved in favor of indicating that a boat had been used. Def. 56.1, ECF 37-10, ¶ 57.

The parties have jointly stipulated that the Vessel Time Analysis is "accurate and reliable in documenting the hours that Ricketts spent on a vessel during his employment with M&N," with the exception of the December 10, 2021 entry, which the parties dispute.[4] Joint Stip., ECF 37-12, ¶¶ 1–2. Using the Vessel Time Analysis, Defendant's counsel calculated that Ricketts was employed by M&N for 8,432.5 hours across both his Norfolk and New York assignments. King Decl., ECF 37-11, ¶ 9. Of that total, Defendant contends that Plaintiff was on a vessel for 1,815 hours, or 21.52 percent of the total time. *Id.* ¶¶ 10–11.

Plaintiff disputes Defendant's methodology, contending that Ricketts's time on boat should instead be measured by the day, that the relevant time period is the ten months Ricketts was stationed in New York, and that Ricketts should receive additional "seafaring time" credit for 16 days spent maintaining the Pile Diver's equipment and three days engaged in a required seaman skills training, although he was not technically on a vessel on those days. Pl. 56.1, ECF 33-1, ¶¶ 81–89; *see generally* Pl.

---

[4] Specifically, Plaintiff contends that this was seaman's work because he "did major service to the vessel," including changing the engine oil and air filters, while Defendant does not count this as "On Boat work." Hofmann Affirmation, ECF 33-31, ¶ 6.

Counter-56.1, ECF 35-1; *see also* Ricketts Affirmation, ECF 33-6, ¶¶ 26, 33–34. So measured, Plaintiff calculates that Ricketts spent 90 days "perform[ing] qualified seaman's work" out of 179 working days stationed in New York, or 50 percent of his time. Pl. 56.1, ECF 33-1, ¶ 89; *see* Ricketts Affirmation, ECF 33-6, ¶¶ 18, 21–26.

In the alternative, using Defendant's calculation method, Plaintiff asserts that of his total hours of employment with M&N across both his "Norfolk Era" and "New York Era" (which Plaintiff determines to be 8,440.5), only 7,345.5 are "eligible" to be counted as working hours, because 1,095 of those hours comprised paid time off. Hofmann Affirmation, ECF 33-31, ¶¶ 7–8 (adding 6,761.5 Norfolk hours to 1,679 New York hours). Plaintiff calculates that he was "on boat" for 1,831 total hours across both "eras" (1,255 in Norfolk and 576 in New York).[5] *Id.* ¶ 7 (capitalization altered). Calculating his on-boat time as a percentage of his total employment, minus paid time off, Plaintiff assesses that he spent approximately 21 percent of his time on boat while in Norfolk and 42.1 percent of his time on boat in New York. *Id.* ¶¶ 7, 10–12.[6]

Plaintiff is not a member of a labor union. Pl. Dep., ECF 33-9, at 25:4–5. As relevant here, he is a credentialed Association of Diving Contractors surface supplied air diving supervisor, a NAUI advanced SCUBA diver, and holds "Federal Highway Administration, National Highway Institute FHWA-NHI certificates for Underwater

---

[5] Plaintiff does not explain the discrepancies in total hours of employment and total on-boat hours between his and Defendant's calculations (8,440.5 vs. 8,432.5 hours of employment; 1,831 vs. 1,815 on-boat hours, respectively). There are only eight hours associated with the disputed December 10, 2021 entry. *See* Vessel Time Analysis, ECF 37-13, at 34.

[6] Using Plaintiff's figures and methodology, the Court calculates that he spent approximately 24.93 percent of his total employment with M&N on a vessel, as follows: total hours on boat (1,831) / total eligible working hours (7,345.5) x 100 = 24.93 percent. *See* Hofmann Affirmation, ECF 33-31, ¶¶ 7–12.

8

Bridge Repair/Rehab/ Countermeasures and Inspections," as well as certificates of completion for safe boating operation courses provided by M&N. Pl. 56.1, ECF 33-1, ¶ 3; *see* Pl. Dep., ECF 33-9, at 21:3–23:22; Melnyczuk Dep., ECF 33-10, at 41:10–19; *cf.* Def. 56.1, ECF 37-10, ¶ 30.

## II.  Procedural History

As noted above, Plaintiff filed his complaint on July 3, 2023.[7] Compl., ECF 1. On October 2, 2023, Defendant answered the complaint. Answer, ECF 12. An initial conference was held on November 14, 2023, during which Defendant indicated that it may seek to move for summary judgment on the seaman status issue before conducting expert discovery on Plaintiff's damages. Nov. 14, 2023 ECF Min. Entry & Order. Following the exchange of some discovery, the parties engaged in private mediation. *See* Sept. 17, 2024 ECF Min. Entry & Order; Dec. 6, 2024 ECF Order.

The mediation process was ultimately unsuccessful because of Plaintiff's disputed seaman status, on which the parties requested a "judicial determination." Joint Letter, ECF 24, at 1. On March 21, 2025, the parties requested a pre-motion conference on anticipated cross-motions for summary judgment on the issue, and the Court directed the parties to propose a briefing schedule and to continue discovery in the interim. Joint Status Report, ECF 26; Mar. 28, 2025 ECF Order; Joint Letter, ECF 27; Apr. 8, 2025 ECF Order (entering parties' proposed briefing schedule). Following numerous extensions of the deadline to submit the parties' motions, on August 6 and 7, 2025, the parties filed their bundled motion papers. Pl. Cross-Mot., ECF 33; Def. Mot. for Summ.

---

[7] On September 1, 2023, the parties consented to magistrate judge jurisdiction. *See* Consent to Jurisdiction, ECF 10; Consent to Jurisdiction, ECF 11.

J., ECF 34; *see also* Def. Mot., ECF 37 (refiling ECF 34, Defendant's motion for summary judgment, with separate ECF files).

**DISCUSSION**

## I. Legal Standards

### A. Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Darnell v. Pineiro*, 849 F.3d 17, 22 (2d Cir. 2017). "A fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law.'" *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Further, a factual dispute is "genuine" if "'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113–14 (2d Cir. 2017) (quoting *Anderson*, 477 U.S. at 248). The Court must "view all facts in this case in the light most favorable to the non-movant, resolving all ambiguities in [the non-movant's] favor." *Borley v. United States*, 22 F.4th 75, 78 (2d Cir. 2021). "Put another way, summary judgment is appropriate only where the record taken as a whole could not lead a rational trier of fact to find for the non-movant." *Id.* (alterations and quotation marks omitted).

"The movant bears the burden of 'demonstrat[ing] the absence of a genuine issue of material fact.'" *Nick's Garage, Inc.*, 875 F.3d at 114 (alteration in original) (quoting *Celotex Corp.*, 477 U.S. at 323). Once the moving party has satisfied their burden, "'the nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*.'" *Brizzi v. Utica Mut. Ins. Co.*, 529 F. Supp. 3d 44, 51 (E.D.N.Y. 2021)

10

(emphasis in original) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475

U.S. 574, 587 (1986) (internal quotation marks omitted)); *see also Anderson*, 477 U.S. at 252

("The mere existence of a scintilla of evidence in support of the [non-movant's] position

will be insufficient; there must be evidence on which the jury could reasonably find for

the [non-movant].").

Summary judgment must be denied "if there is any evidence in the record that

could reasonably support a jury's verdict for the non-moving party." *Marvel Characters,*

*Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002). Further, Rule 56(c)(1) provides that:

> A party asserting that a fact cannot be or is genuinely disputed must
> support the assertion by: (A) citing to particular parts of materials in the
> record, including depositions, documents, electronically stored
> information, affidavits or declarations, stipulations (including those made
> for purposes of the motion only), admissions, interrogatory answers, or
> other materials; or (B) showing that the materials cited do not establish the
> absence or presence of a genuine dispute, or that an adverse party cannot
> produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1); *see also Lener v. Hempstead Pub. Schs.*, 55 F. Supp. 3d 267, 274

(E.D.N.Y. 2014).

When determining whether a movant is entitled to summary judgment, courts

do not weigh the evidence or make credibility determinations to decide the truth of the

matter, but instead assess "'whether there is a genuine issue for trial.'" *Green v. Town of*

*E. Haven*, 952 F.3d 394, 406 (2d Cir. 2020) (quoting *Anderson*, 477 U.S. at 249, 255).

District courts are "required to 'resolve all ambiguities, and credit all factual inferences

that could rationally be drawn, in favor of the party opposing summary judgment.'"

*Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006) (quoting

*Cifra v. G.E. Co.*, 252 F.3d 205, 216 (2d Cir. 2001)); *see also Johnson v. Killian*, 680 F.3d 234,

236 (2d Cir. 2012) (per curiam). In addition, courts "may not properly consider the

record in piecemeal fashion, trusting innocent explanations for individual strands of

evidence; rather, it must review all of the evidence in the record." *Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 386 (2d Cir. 2020) (quotation marks omitted).

Cross-motions for summary judgment are examined using the same standards, and the court's role is to "determine whether either of the parties deserves judgment as a matter of law on facts that are not in dispute." *AFS/IBEX v. AEGIS Managing Agency Ltd.*, 517 F. Supp. 3d 120, 123 (E.D.N.Y. 2021); *see Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001). Accordingly, the court must examine each party's motion "on its own merits" and draw "all reasonable inferences . . . against the party whose motion is under consideration." *Morales*, 249 F.3d at 121.

## B. Seaman Status Under the Jones Act

The Jones Act allows a "seaman injured in the course of employment" to sue their employer for negligence. 46 U.S.C. § 30104(a). Congress first passed the law in 1920, recognizing a need for "heightened legal protections" for seamen (as opposed to other maritime workers, like stevedores and longshoremen) because of their unique "exposure to the perils of the sea." *Chandris, Inc. v. Latsis*, 515 U.S. 347, 354 (1995) (quotation marks omitted). Specifically, seamen are not only "liable to sudden sickness from change of climate, exposure to perils, and exhausting labour," to quote Justice Story, but also often do not have the same access to appropriate medical care as land-based workers. *Harden v. Gordon*, 11 F. Cas. 480, 483 (C.C.D. Me. 1823); *see also Chandris*, 515 U.S. at 350–51. For example, in *Chandris*, the respondent suffered a detached retina before he left port in Baltimore, but because it was not properly diagnosed until after his ship arrived in Bermuda, he lost 75 percent of his vision in his right eye. 515 U.S. at 350–51.

The Jones Act does not define "seaman," but the Supreme Court has adopted various tests and standards to guide district courts' analysis over the years. *See id.* at

12

355–57. Initially, in *Warner v. Goltra*, the court declared that "a seaman is a mariner of any degree, one who lives his life upon the sea." 293 U.S. 155, 157 (1934). Later, in *Norton v. Warner Co.*, the court defined "seaman" as one who "at all times contribute[s] to the labor about the operation and welfare of the ship when she is upon a voyage." 321 U.S. 565, 572 (1944) (quotation marks omitted). Confusion arose, however, as Jones Act cases developed in parallel with those arising under the Longshore and Harbor Workers' Compensation Act ("LHWCA"), which provides compensation for land-based maritime workers. *See Chandris*, 515 U.S. at 355. Because the latter statute excludes the "'master or member of a crew of any vessel'" from coverage, courts often decided Jones Act cases by excluding workers covered by the LHWCA and vice versa, muddying the distinction between which workers the mutually exclusive statutes were intended to cover. *See id.* at 355–56 (quoting 33 U.S.C. § 902(3)(G)); *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 352–53 (1991); *see also O'Hara v. Weeks Marine, Inc.*, 294 F.3d 55, 62 (2d Cir. 2002) (observing that "the LHWCA authorizes maritime workers *other than* seamen to recover for negligence, but only against parties *other than* their employers" (emphasis in original)). Accordingly, in *Wilander*, the Supreme Court clarified that "[t]he key to seaman status is employment-related connection to a vessel in navigation" and that "a necessary element of the connection is that a seaman perform the work of a vessel" — that is, "an employee's duties must 'contribut[e] to the function of the vessel or to the accomplishment of its mission.'" 498 U.S. at 355 (quoting *Offshore Co. v. Robison*, 266 F.2d 769, 779 (5th Cir. 1959)).

Still, the *Wilander* decision did not identify what form that "employment-related connection to a vessel" must take for a plaintiff to qualify as a seaman for purposes of the Jones Act. *Id.* In *Chandris*, the Supreme Court articulated a two-pronged test for seaman status with specific benchmarks: (1) the employee's duties must "contribute to

13

the function of the vessel or to the accomplishment of its mission," and (2) the employee "must have a connection to a vessel in navigation . . . that is substantial in terms of both its duration and its nature." 515 U.S. at 376; *see id.* at 368–69. The court emphasized that "the ultimate inquiry" is one of status: "whether the worker in question is a member of the vessel's crew" — and thus a seaman — "or simply a land-based employee who happens to be working on the vessel at a given time" — and therefore not. *Id.* at 370.

The first prong is a liberal test. The "'putative seaman need not aid in the navigation or contribute to the transportation of the vessel, but a seaman must be doing the ship's work.'" *Matter of Buchanan Marine, L.P.* ("*Buchanan Marine*"), 874 F.3d 356, 365 (2d Cir. 2017) (quoting *O'Hara,* 294 F.3d at 63 (internal quotation marks omitted)). To illustrate the liberal standard: In *Harbor Tug & Barge Co. v. Papai*, the worker-respondent was painting the housing structure of a tugboat when he was injured, giving rise to the case, and the employer-petitioner did not dispute that a jury could find that this could contribute to the vessel's mission. 520 U.S. 548, 551, 554 (1997).

Consequently, seaman status often turns on *Chandris*'s second "substantial connection" prong. *Id.* at 554–55. The *Chandris* court held that "[a] worker who spends less than about 30 percent of his time in the service of a vessel in navigation should not qualify as a seaman under the Jones Act" in the ordinary case. 515 U.S. at 371. The court derived this number from surveying Fifth Circuit cases that had found this "temporal gloss" illustrative of a substantial rather than sporadic connection. *Id.* at 366; *see also id.* at 367 (collecting cases). But the Supreme Court also made plain that this durational threshold is a "rule of thumb," not a bright line rule; seaman status may change along with the worker's assignment, so as not to foreclose relief for, *e.g.*, a longtime shore-based worker who is injured shortly after reassignment to a ship. *Id.* at 371–72. Rather, the test is one of the "totality of the circumstances": whether the worker "'is a member

14

of the vessel's crew or simply a land-based employee who happens to be working on the vessel at a given time.'" *Buchanan Marine*, 874 F.3d at 366 (quoting *Chandris*, 515 U.S. at 370); *see also Papai*, 520 U.S. at 555 (observing that "the inquiry into the nature of the employee's connection to the vessel must concentrate on whether the employee's duties take him to sea"). The Fifth Circuit in *Sanchez v. Smart Fabricators of Texas, L.L.C.* offered additional inquiries as guides in assessing whether the employee's connection is substantial in nature:

> (1) Does the worker owe his allegiance to the vessel, rather than simply to a shoreside employer? (2) Is the work sea-based or involve seagoing activity? (3) (a) Is the worker's assignment to a vessel limited to performance of a discrete task after which the worker's connection to the vessel ends, or (b) Does the worker's assignment include sailing with the vessel from port to port or location to location?

997 F.3d 564, 574 (5th Cir. 2021). While Fifth Circuit precedent is not binding on this Court, the Supreme Court has observed that its analysis is persuasive in light of that circuit's "substantial Jones Act caseload." *Chandris*, 515 U.S. at 365. At bottom, the Supreme Court instructs that courts should "focus upon the essence of what it means to be a seaman" rather than "create detailed tests to effectuate the congressional purpose." *Id.* at 369.

Importantly, the Supreme Court has also expressly observed that whether a worker is a seaman is "a mixed question of law and fact, and it often will be inappropriate to take the question from the jury." *Papai*, 520 U.S. at 554. However, summary judgment is appropriate "'where the facts and the law will reasonably support only one conclusion.'" *Id.* (quoting *Wilander*, 498 U.S. at 356). But if "'reasonable persons, applying the proper legal standard, could differ as to whether the employee'" is a seaman, "'it is a question for the jury.'" *Chandris*, 515 U.S. at 369 (quoting *Wilander*, 498 U.S. at 356).

15

## II. Analysis

Here, for purposes of this motion, the parties do not dispute that Ricketts's duties "contribute[d] to the function of the vessel or to the accomplishment of its mission." *Id.* at 376; *see Buchanan Marine*, 874 F.3d at 365 (observing that, to qualify as a seaman, the employee "'must be doing the ship's work.'" (quoting *O'Hara,* 294 F.3d at 63) (internal quotation marks omitted)); *see also* Def. Mem., ECF 37-9, at 15, 16 (noting that the first *Chandris* prong allows "'[a]ll who work at sea in the service of a ship'" to be "'*eligible* for seaman status'" (quoting *Chandris*, 515 U.S. at 368 (emphasis in original) (internal quotation marks omitted)), and arguing that "the evidence is undisputed that Ricketts fails the second prong of the *Chandris* test"); Pl. Mem., ECF 33-38, at 26 ("Here, there is no question that Mr. Ricketts's work contributed to the function of PILE DIVER and the accomplishment of its dive inspection missions[.]"). *But cf.* Def. Counter-56.1, ECF 38-1, ¶ 84 (objecting to Plaintiff's statement that his "duties contributed to the function of the vessel and to the accomplishment of its mission" on the grounds that "this characterization of Ricketts'[s] time when he is not on a vessel is a legal argument cloaked in the factual Affirmation of David Ricketts"). Accordingly, in this posture, where each side is moving for partial summary judgment on the issue of Ricketts's status as a seaman, the only question before the Court is whether the summary judgment record evinces only one conclusion as to the "substantial connection" prong of the *Chandris* test. *See Celotex Corp.*, 477 U.S. at 322–23.

Defendant argues that Plaintiff cannot qualify as a seaman because his "connection to a vessel was insubstantial both in its duration and its nature." Def. Mem., ECF 37-9, at 16. In particular, Defendant posits that Plaintiff's time on boat — analyzed as a percentage of total hours employed by M&N — fails to meet *Chandris*'s 30

16

percent guideline and that Plaintiff's livelihood was primarily derived from land-based activities. *Id.* at 17–19, 19–24.

Plaintiff counters by arguing that the record shows that he was a seaman, for two reasons. First, Plaintiff argues that the durational prong is satisfied because, analyzing Plaintiff's time as a percentage of "vessel related work days," excluding weekends and paid time off, and only relative to the period of time Plaintiff was stationed in New York, Ricketts spent at least 42 percent of his time on a vessel. Pl. Mem., ECF 33-38, at 19. Second, Plaintiff also urges that Ricketts's time spent in navigation and his exposure to the "perils of the sea" militate in favor of a finding of seaman status. *Id.* at 27–33, 33–40. In the alternative, Plaintiff asks the Court for a determination that he is a covered employee under the LHWCA.[8] *Id.* at 40–44.

In order to determine whether the Court can reach a conclusion on Plaintiff's seaman status as a matter of law, the Court focuses on three questions that go to the heart of the dispute. First, in analyzing whether Plaintiff had a substantial *durational* connection to a vessel or group of vessels as required by *Chandris*, the Court must evaluate if it is possible to conclude, as a matter of law and on the basis of the present record, (1) whether Plaintiff's job assignment changed or remained the same when he relocated from Norfolk to New York; and (2) which, if any, of Plaintiff's on-shore hours

---

[8] Plaintiff argues that, should the Court find that Plaintiff is not a seaman as a matter of law, then it should rule that he is covered under the LHWCA, 33 U.S.C. § 901, *et seq. See* Pl. Mem., ECF 33-38, at 40–44. But as Defendant correctly notes, Plaintiff has not pled a cause of action under the LHWCA, and thus the issue is not properly before the Court. *See generally* Compl., ECF 1. It is axiomatic that a court cannot grant summary judgment on a claim not contained in the complaint. *See Alpha Cap. Anstalt v. Oxysure Sys., Inc.*, 216 F. Supp. 3d 403, 411 (S.D.N.Y. 2016) (collecting cases). Moreover, federal courts are precluded from issuing advisory opinions in the absence of a live dispute between the parties. *See Carney v. Adams*, 592 U.S. 53, 58 (2020) (collecting cases). Accordingly, that portion of Plaintiff's cross-motion for summary judgment is denied.

17

were in service of a vessel (or group of vessels) and whether such hours should be credited in evaluating his connection to the vessel. In addition, the Court must assess whether the record evinces no material facts in dispute concerning whether Ricketts had a connection to a vessel or group of vessels that was substantial in *nature. See Chandris*, 515 U.S. at 368 (requiring that a seaman's connection to a vessel or group of vessels be "substantial in terms of both its duration and its nature"). Finding that there are genuine disputes of material fact as to each of these issues, the Court finds that there is sufficient evidence for a jury to conclude either that Ricketts was a seaman or that he was not and, accordingly, the question must be left for a jury. *See Papai*, 520 U.S. at 554; *Chandris*, 515 U.S. at 369.

### A. Substantial Durational Connection

#### 1. Did Ricketts's Transfer to New York Change His Basic Assignment?

As discussed, a maritime "worker who spends less than about 30 percent of his time in the service of a vessel in navigation" is generally presumed to not be a seaman as a matter of law. *Chandris*, 515 U.S. at 371; *see Quiles v. City of New York*, 978 F. Supp. 2d 374, 383–84 (S.D.N.Y. 2013); *Daza v. Pile Found. Const. Co.*, 983 F. Supp. 2d 399, 409 (S.D.N.Y. 2013); *see also Guarascio v. Drake Assocs. Inc.*, No. 06-CV-15185 (CM), 2008 WL 4222034, at *1, *3 (S.D.N.Y. Sept. 15, 2008). However, recognizing "the inherent unfairness in denying seaman status to a maritime worker injured at the very beginning of a sea-based assignment," *Chandris* instructs courts to measure this time relative to the duration of the worker's assignment at the time of injury. *Rivera v. Arctic Ocean Shipping Ltd.*, No. 09-CV-4672 (CBA) (JMA), 2012 WL 1004840, at *4 (E.D.N.Y. Mar. 23, 2012) (citing *Chandris*, 515 U.S. at 372). This exception does not mean that "a maritime worker becomes a seaman every time he is exposed to the perils of the sea." *Id.* A worker's basic assignment does not change if he was on a vessel-based assignment that was otherwise

18

discrete and time limited. *See id.* at *5. Nor is the worker's job title, *see Quiles*, 978 F. Supp. 2d at 384, or the length of his assignment prior to injury, *see Bayham v. Grosse Tete Well Serv., Inc.*, Civil Action No. 11-1815, 2012 WL 1865737, at *6 (E.D. La. May 22, 2012), dispositive. What matters instead is whether "his essential duties are changed." *Chandris*, 515 U.S. at 372. For example, in *Uzdavines v. Weeks Marine, Inc.*, the Second Circuit found that a worker who had been assigned as an oiler on a dredge for three or four weeks before his injury had a substantial connection to the vessel for that period, even though he had been a land-based deckhand for the previous 35 years. 418 F.3d 138, 145 (2d Cir. 2005).

Here, Plaintiff posits that his transfer to New York was effectively a new assignment, such that his time in "service of a vessel" should only be calculated relative to his employment in New York. *Chandris*, 515 U.S. at 371; *see* Pl. Mem., ECF 33-38, at 2; Pl. Mem. in Opp'n, ECF 35, at 1–4; Pl. Corrected Reply Mem., ECF 36, at 2–4. In support of his position, Plaintiff highlights the fact that his time on boat increased significantly while he was stationed in New York, compared to when he was stationed in Norfolk. *See* Hofmann Affirmation, ECF 33-31, ¶¶ 7, 10–12 (calculating that Plaintiff spent approximately 21 percent of his time on boat while stationed in Norfolk and 42 percent of his time on boat while stationed in New York); *see also* Vessel Time Analysis, ECF 37-13 (providing underlying data); Pl. Dep., ECF 33-9, at 109:7–14 (explaining that, although in Norfolk, Plaintiff would work out of an office, Plaintiff had "never been to an office in New York City at Moffatt & Nichol ever" and did not know where any such office was located), 135:3 (testifying that "I had my own office in Norfolk").

Defendant argues that because Ricketts had the same title and responsibilities in in New York as in Norfolk, his assignment did not change. *See* Def. Mem. in Opp'n, ECF 38, at 19–24. Indeed, Defendant emphasizes the undisputed fact that Ricketts had

been assigned to work on a New York-based project while stationed in Norfolk to illustrate that "his job duties and responsibilities were similar, if not identical, in both locations." *Id.* at 23–24; *see also* Pl. Dep., ECF 33-9, at 114:8–18.

Drawing all reasonable inferences in favor of Plaintiff on this point, however, the summary judgment record does not conclusively establish that Ricketts's basic assignment remained the same when he was transferred from Norfolk to New York. *See Quiles*, 978 F. Supp. 2d at 384. Although Plaintiff's job title and essential duties remained the same when he was transferred, the proportion of time he spent on a vessel increased significantly while he was stationed in New York. *Compare* Employment Offer, ECF 37-4, *with* Transfer Mem., ECF 33-8 (indicating that Ricketts's title remained the same after his transfer to New York); *see* Def. 56.1, ECF 37-10, ¶¶ 4, 14–16; Pl. 56.1, ECF 33-1, ¶ 3; Pl. Dep., ECF 33-9, at 65:13–25, 67:8–10, 74:20–77:9 (describing Plaintiff's responsibilities while stationed in Norfolk); Pl. 56.1, ECF 33-1, ¶ 8; Def. 56.1, ECF 37-10, ¶¶ 19, 28; Pl. Dep., ECF 33-9, at 90:16–91:16, 102:24–105:20, 133:19–23; Ricketts Affirmation, ECF 33-6, ¶¶ 11–12 (same, while stationed in New York); *see also* Hofmann Affirmation, ECF 33-31, ¶¶ 7, 10–12 (calculating that Plaintiff spent approximately 21 percent of his time on boat while stationed in Norfolk and 42 percent of his time on boat while stationed in New York). Viewing this latter fact in the light most favorable to Plaintiff, and "resolving all ambiguities in [his] favor," the Court finds that based on the record on summary judgment, a reasonable jury could find that Plaintiff's reassignment to New York resulted in a material change in his job responsibilities. *Borley*, 22 F.4th at 78; *see Chandris*, 515 U.S. at 372.

That said, this analysis does not mean that summary judgment in favor of Plaintiff is warranted on this point. First, analyzing the same facts in the light most favorable to Defendant, as the non-movant on Plaintiff's cross-motion, the Court

observes that a jury could also find that his basic assignment did *not* change, and adopt

Defendant's view that the jobs were "similar, if not identical."[9] Def. Mem. in Opp'n,

ECF 38, at 19 (capitalization altered). Second, regardless of whether Plaintiff's Jones Act

time should be measured based on his time in Norfolk and New York or in New York

only, the Court finds that there are genuine disputes of material fact as to how to

evaluate which hours should be attributed to Plaintiff's time spent "in the service of a

vessel in navigation." *Chandris*, 515 U.S. at 371.

2. *How Many Hours Did Plaintiff Spend "in the Service of a Vessel in Navigation"?*

As set forth above, Plaintiff and Defendant do not dispute the essential facts as

described in the Vessel Time Analysis — that is, that Plaintiff worked for M&N for at

least 8,432.5 hours and was engaged in qualified on-vessel work for at least 1,815 hours.

*See* Joint Stip., ECF 37-12; Vessel Time Analysis, ECF 37-13; King Decl., ECF 37-11, ¶ 9;

*see also* Hofmann Affirmation, ECF 33-31, ¶ 7 (adding 6,761.5 to 1,679 (8,440.5)).

However, certain material details remain in dispute. Most relevantly, Plaintiff posits

that his Jones Act time should include time spent ashore "perform[ing] PILE DIVER

related seaman's work" and attending a three-day seaman skills training, while

---

[9] The record makes clear that Plaintiff was not "at sea" in the traditional sense originally contemplated by the Jones Act. Rather, his time on boat for any given assignment never included overnight work and, in both Norfolk and New York, Plaintiff and his crew could access different inspection sites by boat, land, or truck. *See* Def. 56.1, ECF 37-10, ¶¶ 6–12; Pl. Dep., ECF 33-9, at 39:8–41:4, 67:11–13 (Norfolk); *see also* Def. 56.1, ECF 37-10, ¶ 27; Pl. Dep., ECF 33-9, at 110:15–17 (New York). Accordingly, even though Plaintiff appears to have spent more time on a vessel while stationed in New York than in Norfolk, a jury could find that his essential duties were "similar, if not identical" across both posts and that he was more of a land-based employee than a seaman under the Jones Act. *See* Def. Mem. in Opp'n, ECF 38, at 19 (capitalization altered). At core, however, whether his move to New York brought changed job responsibilities is a question of fact, not law. Given the Supreme Court's clear directive that the totality of the circumstances must be analyzed in evaluating seaman status and that close cases are best left to a jury, the Court finds that this is a genuine dispute of material fact. *See Chandris*, 515 U.S. at 369.

21

Defendant argues that it should only include time spent physically on a boat.[10] Pl. Mem., ECF 33-38, at 22; *see id.* at 19–25; Def. Mem., ECF 37-9, at 18–19; *see also supra* note 5 (identifying a 16-hour discrepancy between Plaintiff and Defendant's calculations of on-boat time).

For support for the proposition that Plaintiff's time spent "doing vessel related inspection work" and in a "seaman skills training" should be credited towards his Jones Act time, Plaintiff relies on a case from the District of Maryland, *Ryan v. United States*. Pl. Mem., ECF 33-38, at 23, 24. In *Ryan*, the court denied the defendant's motion for summary judgment, finding that the issue of whether work that a commercial rescue diver "performed on shore in relation to the diving mission" comprised seaman's work was a question of fact for a jury. 331 F. Supp. 2d 371, 378 (D. Md. 2004). This was because his "diving duties necessitated that he not only spend time onboard the dive boat to be in a position to provide rescue services, but his duties also required that he perform creditable service on shore, *e.g.*, outfitting the boat and . . . maintaining the diving equipment." *Id.*

---

[10] The parties also dispute whether the percentage of the time he was on boat should be measured by the hour (Defendant) or the day (Plaintiff). While no party identified a specific case on this point, and the Court could find none, the Court finds that the percentage is appropriately measured by the hour. *See O'Hara v. Weeks Marine, Inc.*, 294 F.3d 55, 64 (2d Cir. 2002) (observing that the plaintiff "spent more than half his working hours during a five-month period aboard the barges"); *Sologub v. City of New York*, 202 F.3d 175, 177 (2d Cir. 2000) (noting that the plaintiff served "[o]nly one eight-hour tour of duty . . . aboard a ferry"); *Dinome v. City of New York*, No. 14-CV-9375 (AJP), 2016 WL 3063964, at *4 (S.D.N.Y. May 31, 2016) (denying summary judgment where there was a dispute of material fact as to how many "hours . . . of [the plaintiff's] workday" were spent on the vessel); *Guarascio v. Drake Assocs. Inc.*, No. 06-CV-15185 (CM), 2008 WL 4222034, at *2 (S.D.N.Y. Sept. 15, 2008) (same, where the plaintiff was "only 7.75 'Jones Act' hours shy of the 30 percent mark"); *Daza v. Pile Found. Const. Co.*, 983 F. Supp. 2d 399, 410 (S.D.N.Y. 2013) (finding that because the plaintiff's navigation-related activities "took two hours at most" during a 40-hour workweek, he was not "even close" to the 30 percent threshold).

At least one court in this circuit has found similar questions of fact appropriate for a jury to decide. In *Guarascio*, another case involving a commercial diver who used vessels as diving platforms, the court declined to grant the defendant's motion for summary judgment, observing that a jury could reasonably credit the plaintiff's time working on a dry-docked vessel and spent in maritime transit as time "in the service of a vessel," contrary to the defendant's characterizations. 2008 WL 4222034, at *2–3 (quotation marks and alterations omitted). Including these hours, the *Guarascio* plaintiff's Jones Act time percentage increased from 27.2 percent to 29.4 percent. *Id.* at *2.

Here, the record shows that Ricketts's duties included varied maintenance work in support of the crew's diving operations. Def. 56.1, ECF 37-10, ¶ 4; Pl. 56.1, ECF 33-1, ¶ 3; *see* Pl. Dep., ECF 33-9, at 65:17–25, 67:8–10 (Norfolk); Pl. 56.1, ECF 33-1, ¶¶ 8, 13; Def. Counter-56.1, ECF 38-1, ¶¶ 8, 13 (New York). However, unlike in *Ryan*, where all of the plaintiff's diving was done from a boat, here, Plaintiff's maintenance work in support of dive operations was not necessarily anchored to the use of a "vessel in navigation." *Chandris*, 515 U.S. at 371; *see Ryan*, 331 F. Supp. 2d at 378. Ricketts testified that there were times where he had dives when he did not need to use a vessel — *i.e.*, when he would dive from land or using the Big Box Truck as a platform — and therefore, his hours spent maintaining dive equipment were not exclusively in service of a vessel. Pl. Dep., ECF 33-9, at 72:2–24; *see* Def. Counter-56.1, ECF 38-1, ¶ 7. For example, for an approximately three-week project at Port Newark, in New Jersey, Plaintiff's crew used a vessel "[m]aybe two" days and used the box truck as a diving platform another 14 days. Pl. Dep., ECF 33-9, at 114:20–115:14; *see also id.* at 110:10–17 (describing the Quonset Point job, which used the box truck, not a vessel, as a diving platform). Given the parties' focus on time Ricketts spent on board, and his varied

23

responsibilities, the summary judgment record is not clear as to whether Ricketts's diving and inspection duties *on the boat* "necessitated" that he "perform creditable service on shore." *Ryan*, 331 F. Supp. 2d at 378.

Accordingly, as in *Guarascio* and *Ryan*, the Court finds that a jury could plausibly find that at least some of Ricketts's onshore maintenance work was "in the service of a vessel." *Chandris*, 515 U.S. at 371. Unlike the *Guarascio* court, however, the Court does not have the benefit of precise, undisputed numerators and denominators with which to determine whether the challenged Jones Act hours would nudge him above or below *Chandris*'s 30 percent threshold. But more fundamentally, whether those hours should or should not count towards Plaintiff's Jones Act time is a disputed question of fact that is best resolved by a jury.

Accordingly, the Court cannot find, as a matter of law, that Ricketts's hours are so far below 30 percent of his assignment that he cannot be considered a seaman under *Chandris*. Rather, there is a dispute of material fact as to whether Ricketts had a substantial durational connection to a vessel in navigation.

### B. Substantial Nature Connection

Likewise, the Court finds that the nature of Ricketts's connection to a vessel is a question of fact best left to a jury.

As discussed above, *Chandris* requires that a seaman's connection to a vessel in navigation (or group of such vessels) be "substantial in terms of *both* its duration and its nature." 515 U.S. at 368 (emphasis added). However, the ultimate inquiry is one of the totality of the circumstances. *See id.* at 369 (directing courts to "focus upon the essence of what it means to be a seaman" rather than "create detailed tests"). Courts in the Second Circuit look to factors such as whether the purported seaman is "regularly expose[d] . . . to the special hazards and disadvantages of the sea" by virtue of his

24

operating or crewing a vessel in navigation, whether he was a member of a maritime union or held special maritime licenses, or whether he ever slept overnight on the vessel. *Buchanan Marine*, 874 F.3d at 366; *see id.* at 362, 366–67; *Sologub v. City of New York*, 202 F.3d 175, 180–81 (2d Cir. 2000); *Daza*, 983 F. Supp. 2d at 410; *Quiles*, 978 F. Supp. 2d at 384; *Casser v. McAllister Towing & Transp. Co., Inc.*, No. 10-CV-1554 (JSR), 2010 WL 5065424, at *3 (S.D.N.Y. Dec. 7, 2010). This is in accord with the test announced in the Fifth Circuit, which asks whether the plaintiff owes his allegiance to the vessel or his employer, whether his work is "sea-based," and whether the plaintiff's assignment is discrete or ongoing. *Sanchez*, 997 F.3d at 574. For example, in *Buchanan Marine*, the Second Circuit found that because the plaintiff (1) "never operated a barge" and only worked aboard them while secured, (2) reported to the dock foreman and not a ship's officer, (3) belonged to an equipment operator's union rather than a maritime union and did not hold a maritime license, and (4) never spent the night aboard a barge, he did not "'derive[] his livelihood from sea-based activities.'" 874 F.3d at 366–67 (quoting *O'Hara*, 294 F.3d at 64 (internal quotation marks omitted)). Similarly, in *Daza*, the court found that even though the plaintiff's connection with a vessel was more substantial — his assigned barge sometimes traveled the East River with him aboard, and he would occasionally assist the tugboat and barge crews with sea-related tasks — because the plaintiff's "level of involvement with the vessel *as a vessel*" was not "even close to the 30 [percent] guideline," it was not sufficient to make that plaintiff a seaman. 983 F. Supp. 2d at 410.

Here, Ricketts was charged with operating vessels including the Pile Diver. This required that he navigate from the launch site to the inspection sites. *See* Pl. 56.1, ECF 33-1, ¶¶ 9–11; Def. 56.1, ECF 37-10, ¶¶ 21–25; Pl. Dep., ECF 33-9, at 55:23–56:8; *see also* Def. Counter-56.1, ECF 38-1, ¶¶ 9–11. While Plaintiff was stationed in New York, this

25

involved traversing the New York Harbor and Hudson River, where he was subject to some of the "perils of the sea," such as four foot or greater waves and swells and the risk of collision with other vessels in the harbor. Pl. 56.1, ECF 33-1, ¶¶ 17–20; Pl. Dep., ECF 33-9, at 98:17–23; *see* Def. 56.1, ECF 37-10, ¶¶ 22–24; Def. Counter-56.1, ECF 38-1, ¶¶ 9–11, 17–20; *cf. Sologub*, 202 F.3d at 181 (suggesting that the plaintiff's hypothetical assignment "to duty aboard vessels sailing the seas between Manhattan and Staten Island" could affect a Jones Act analysis).

That said, the record on summary judgment makes clear that Plaintiff never slept on board the Pile Diver or any other vessel he used during his employment; he went home after his shift ended. *See* Pl. Dep., ECF 33-9, at 29:6–9, 63:18–22, 95:9–13. "In contrast, a traditional Jones Act seaman normally serves for voyages or tours of duty." *Buchanan Marine*, 874 F.3d at 367 (collecting cases). It is likewise undisputed that Ricketts was not a member of a maritime union, although the parties dispute whether a certificate he holds for completing an M&N required seaman skills training is a "maritime credential." Pl. 56.1, ECF 33-1, ¶¶ 3, 86; Def. 56.1, ECF 37-10, ¶ 30; *see* Pl. Dep., ECF 33-9, at 21:3–23:22; Def. Counter-56.1, ECF 38-1, ¶ 3; Pl. Counter-56.1, ECF 35-1, ¶ 30.

Moreover, Ricketts spent only a portion of his time on a vessel with the vessel actively in navigation, in the sense of traversing a body of water. Plaintiff testified that, while stationed in Norfolk, it could take him anywhere from five minutes to three hours to navigate from a launch site to a bridge, but 30 minutes was typical. *See* Pl. Dep., ECF 33-9, at 70:2–23. While stationed in New York, Plaintiff testified that it would take "15, 20 minutes" to cross the Hudson River to the inspection site. *Id.* at 96:3–11. When he was not operating the vessel, he would either be preparing for dive operations — a

26

process that could take around an hour and a half — or using the vessel as a diving platform — which could take two to three hours. *Id.* at 103:23–104:24. Against the backdrop of his testimony that, on a typical day, he would be on the boat from 7 a.m. to 2 or 3 p.m., this suggests that Plaintiff was actively in navigation for, on average, about one hour out of an eight-hour day. *See id.* at 102:12–23; *see also id.* at 70:2–23.

On the other hand, Plaintiff also testified that once the boat reached the inspection site, it could be tied up or anchored with the engine off or idling but mobile. *See id.* at 68:6–69:8 (Norfolk), 100:8–10 (New York). When necessary, Plaintiff would pilot the boat even while it was being used for an inspection. *See id.* at 62:6–24 (describing the process of driving the boat from pile to pile over the course of a site inspection), 68:24–69:8 (stating, of the Chesapeake Bay Bridge Tunnel site, "the current rips out there, so you're always maneuvering"). Moreover, even if the vessel was tied up or anchored, Plaintiff could still be exposed to maritime perils of the kind described above. *See id.* at 98:19–22 ("[S]etting anchor can be real tricky in the Hudson River when you get [five]-foot wakes from giant barges coming by. I mean, it will wake you up when your boat about flips[.]").

Accordingly, although arguments could be made that Plaintiff was not necessarily using "the vessel *as a vessel*" in navigation for the entire time he was on boat, *Daza*, 983 F. Supp. 2d at 410, given the totality of the circumstances here, the Court finds that there are disputes of material fact such that "'reasonable persons, applying the proper legal standard, could differ'" as to the nature of Ricketts's connection to the boat, *Chandris*, 515 U.S. at 369 (quoting *Wilander*, 498 U.S. at 356). Because he was regularly operating a vessel during his workday, continuously planning dive and inspection operations with the option of using a vessel, and diving into bodies of water, including but not limited to navigable waterways, a trier of fact could rationally decide that,

27

under the totality of the circumstances, Plaintiff ultimately derived his livelihood from the sea. At the same time, a jury could come out the other way — finding that, because Plaintiff never slept aboard the boat, does not hold a special maritime license, and does not belong to a maritime workers' union, the nature of his connection to a vessel in navigation was not substantial enough to be considered a seaman under the Jones Act. *See Buchanan Marine*, 874 F.3d at 366–68. Therefore, the Court finds that the question of whether Ricketts's connection to a vessel was substantial in nature is best left for a jury. *Chandris*, 515 U.S. at 368.

**CONCLUSION**

Given the disputes of material fact as to whether Plaintiff's connection to a vessel in navigation was substantial, the Court cannot determine that Plaintiff was or was not a seaman under the Jones Act as a matter of law. Accordingly, Defendant's motion for partial summary judgment and Plaintiff's cross-motion for the same are denied.

**SO ORDERED.**

Dated: Brooklyn, New York
   March 10, 2026

         *Taryn A. Merkl*
         TARYN A. MERKL
         UNITED STATES MAGISTRATE JUDGE